479 So.2d 169 (1985)
Paul THOMPSON, Petitioner,
v.
Fred CRAWFORD, Director Dade County Jail, et al., Respondents.
No. 84-428.
District Court of Appeal of Florida, Third District.
November 20, 1985.
Varon, Bogenschutz, Williams & Gulkin, P.A., and H. Donn Williams, Jr., Hollywood, Arthur W. Tifford and Peter C. Clemente, Miami, for petitioner.
Jim Smith, Atty. Gen., Janet Reno, State Atty. and Arthur Joel Berger, Asst. State Atty., for respondents.
*170 Before BASKIN, PEARSON and JORGENSON, JJ.
JORGENSON, Judge.
Paul Thompson seeks in the alternative a writ of habeas corpus, a writ of prohibition, or a writ of mandamus. For the reasons which follow, we decline to grant the extraordinary relief requested and remand this cause for trial on the merits.

I. FACTUAL BACKGROUND
On January 15, 1980, Thompson was indicted on four counts of first-degree murder, four counts of kidnapping, and four counts of armed robbery.[1] At Thompson's arraignment on January 23, 1980, defense counsel stated that Thompson had been declared insane or incompetent in a prior federal criminal proceeding.[2],[3] The trial judge (Judge Fuller) entered a plea of not guilty on behalf of Thompson, set the cause for jury trial and, in accordance with Florida Rule of Criminal Procedure 3.210(b), appointed three psychiatrists, Drs. Graff, Mutter, and Jaslow, to examine Thompson.

A. Initial Evaluations
After examining Thompson, the three doctors filed reports with the court in early February, 1980. In his report, Dr. Graff noted that, while Thompson exhibited memory and other problems in his thinking, there were enough inconsistencies in his behavior to raise the possibility that Thompson was actually a "very clever malingerer." Dr. Graff delayed rendering an opinion and, instead, recommended both an intensive evaluation of Thompson over a several-week period in a closed hospital setting (such as the forensic unit at Jackson Memorial Hospital) and testing by an expert psychologist (Dr. Graff recommended Dr. Reichenberg).
Dr. Mutter concluded that Thompson was moderately mentally retarded, was incompetent to stand trial and would require commitment to a mental facility for "the rest of his life."
Dr. Jaslow, who had examined Thompson for the federal court in 1978 (see supra note 2), reported that Thompson now presented a condition even more disturbed than that presented two years before. Dr. Jaslow concluded that Thompson was "grossly" incompetent to stand trial due to *171 chronic brain syndrome and was, at best, only "marginally" competent at the time of the alleged offenses.[4] The doctor opined that the illness did not seem treatable and that Thompson's behavioral patterns "dictate that he be constantly supervised and controlled, so that he cannot be eligible for any criminal activities in the future."
On February 8, 1980, the prosecutor requested that the court follow Dr. Graff's recommendations and order the evaluation of Thompson under the conditions the doctor had suggested. On February 15, 1980, defense counsel filed a notice of intent to rely on the defense of insanity. Over the next several months, the state attempted to have Thompson sent to a Florida hospital for evaluation; however, its efforts were in vain.[5]
On March 7, 1980, the lead homicide investigator interviewed a state prisoner, Fred Gearing. Gearing told the detective that, when Gearing and Thompson were in prison together, Thompson and other prisoners had rehearsed feigning insanity (see infra note 16). In April, the prosecutors requested that the detective produce Gearing; however, by that time, Gearing had been released from prison and had vanished. The court was not informed of these events.
On August 1, 1980, the prosecutor told the court that the state was unable to send Thompson to a hospital for further evaluation.[6],[7] At the prosecutor's request, the court appointed Drs. Graff, Jaslow, and Castiello for a second set of evaluations.[8]
Dr. Castiello concluded that Thompson's mental condition was compatible with a diagnosis of "pseudo dementia" and that Thompson was incompetent to stand trial. Dr. Castiello was unable to reach a conclusion regarding Thompson's mental condition at the time of the alleged offenses. Dr. Graff again noted inconsistencies in Thompson's behavior and concluded that Thompson was "consciously malingering" and that Thompson had the capacity to stand trial. Once more, Dr. Graff recommended that Thompson undergo intensive psychological evaluation. Dr. Jaslow confirmed his prior diagnoses, finding that *172 Thompson continued to be "grossly" incompetent.
On September 23, 1980, the state requested that the court appoint a psychologist to examine Thompson "because of the spectrum [sic] raised by Dr. Graff about the possibility that Thompson [was] consciously malingering... ." Defense counsel complained about the number of state requests for evaluation. The state replied that, after one more set of evaluations, it would stipulate to competency or ask the court to hold a competency hearing.
On September 25, 1980, the court appointed Dr. Reichenberg along with Drs. Castiello and Mutter. Dr. Mutter again concluded that Thompson was incompetent due to chronic brain syndrome. Dr. Castiello confirmed his prior diagnosis, stating that the clinical picture displayed by Thompson was compatible with a state of "pseudo dementia" resulting from a severe mental illness and, again, reported that he could not reach a conclusion regarding Thompson's sanity at the time of the alleged offenses. Dr. Reichenberg did not file a report for the stated reason that he lacked a sufficient basis to give the court an opinion and that only a long-term hospital evaluation could detect whether Thompson was malingering or actually suffering from a mental illness or defect.

B. The Competency  Insanity  Commitment Proceeding
A competency hearing was set for November 28, 1980, and was twice continued and reset for December 16, 1980. However, before the competency hearing was held, the parties came before Judge Goderich on December 12, 1980.[9],[10]
At the December 12, 1980 proceeding the state announced that, based on the reports of Drs. Mutter, Castiello, and Jaslow, which indicated that Thompson was incompetent to stand trial and would not likely regain competency in the near future, it was "willing to stipulate." Despite the fact that none of the doctors' reports contained an opinion that Thompson was insane at the time of the alleged offenses, the state stipulated to this issue as well as to the issue of Thompson's competency to stand trial.[11] The trial court entered (1) an order finding Thompson not guilty by reason of insanity and acquitting him of the offenses, (2) an order finding and adjudging Thompson to be incompetent, and (3) an order finding that Thompson met the criteria set forth in section 916.15, Florida Statutes *173 (Supp. 1980), and committing Thompson to the Department of Health and Rehabilitative Services [HRS] for involuntary hospitalization in accordance with that section and Florida Rule of Criminal Procedure 3.217(b). This last order stated that Thompson had waived his right to a jury trial and that the December 12, 1980 proceeding was a non-jury trial. However, there is no indication on the indictment or otherwise that Thompson waived his right to a jury trial. Thompson was admitted to South Florida State Hospital [South Florida] on January 30, 1981.
On March 10, 1981, the trial court entered a specific commitment order in which reference was made to the psychiatric reports and evaluations of the various doctors who had been appointed to evaluate Thompson (including those made for the federal court in 1978) to support the finding that Thompson was insane at the time of the commission of the crimes. The court stated that the stipulations entered into by counsel for the state and the defense "included ... psychiatric reports and evaluations which dealth with the sanity of the defendant at the time of the commission of the instant offenses." (Emphasis supplied.) Nevertheless, the only doctors who had addressed the issue of Thompson's sanity at the time of the offenses were Dr. Jaslow, who opined that Thompson was marginally competent at the time of the offenses, and Dr. Castiello, who stated that he could not reach a conclusion on the issue.[12]

C. Release Proceedings
On March 25, 1982 (only fourteen months after Thompson had been admitted to South Florida), the hospital's senior forensic psychiatrist, Dr. Koson, and forensic clinical director, Dr. Hahn, sent a letter to Judge Klein stating that it was the "collective and unequivocal" opinion of the disposition board that Thompson was not mentally ill nor dangerous to himself or others. The hospital recommended that Thompson be released as no longer meeting the criteria for involuntary hospitalization or, alternatively, asking that Thompson be released conditionally to the community under section 916.17(1), Florida Statutes (1981), in accordance with an attached "Aftercare Plan." In an attached report, titled "Forensic Psychiatric Summary," Dr. Koson concluded that Thompson's initial picture of toxic confusion, memory disorder, and decreased intellectual capacity resulted from a reversible organic brain syndrome caused by the toxic insult from the fume incident, compounded by three months of steady illicit drug usage and the use of tranquilizers in the early stages of hospitalization. The report stated that, with the cessation of all sedating drugs, Thompson's neurological picture, especially his intellectual functioning, improved dramatically. In fact, despite early I.Q. tests indicating that Thompson was mentally defective, by late fall of 1981 Thompson had passed the G.E.D. (General Education Development) test and had obtained his high school (equivalency) diploma. The report described this feat as "an achievement which is spectacularly in conflict with his prior intellectual functioning."
On April 27, 1982, Thompson filed a "Motion for Conditional Release Pursuant to F.S. 916.17(1)." In response to the motion, a hearing was held on May 11, 1982. At the hearing, the trial court appointed Drs. Mutter, Jaslow, and Reichenberg to evaluate Thompson. After evaluating Thompson, Dr. Mutter concluded in his report:
This individual shows a different clinical picture than when examined on prior occasions. His mind and sensorium are extremely clear and inconsistent with an organically damaged individual. The *174 only explanation is that this individual was feigning a disturbance, which eventually won his acquittal. This is more consistent with a sociopathic personality disorder who has had a history of drug and alcohol abuse. Due to his improvement, he is certainly competent for any future legal proceedings. (Emphasis supplied.)
Drs. Jaslow and Reichenberg also concluded that Thompson was competent and no longer in need of hospitalization. Dr. Reichenberg noted: "The present results are difficult for the examiner to deal with since schizophrenic processes are amendable to reversal but in the examiner's experience `organic' deficit has seldom resulted in recovery noted in this individual."[13]
On June 25, 1982, a hearing was held on Thompson's motion for conditional release. The court-appointed experts (Mutter, Jaslow, and Reichenberg) and staff of the forensic unit of South Florida (Koson, Karpf, a clinical staff psychologist, and Isaacman, director of the treatment team at South Florida) all testified that Thompson no longer met the criteria for continued involuntary hospitalization. At the conclusion of the testimony, Judge Klein expressed his continuing concern with Thompson's history of past violent behavior. The court delayed ruling on Thompson's motion because the court was not satisfied with the aftercare plans submitted by the staff of the forensic unit of South Florida in that they did not guarantee twenty-four-hour custody of Thompson.[14]
On November 15, 1982, Thompson filed a "Memorandum in Support of Motion for Discharge or Conditional Release" contending that his due process rights were being violated because he was being held despite the fact that all the testimony and reports of the many doctors concluded that he no longer met the criteria for involuntary hospitalization and the court was shifting the burden of locating a place of suitable restricted custody onto his shoulders. For support, Thompson relied upon Hill v. State, 358 So.2d 190 (Fla. 1st DCA 1978), which held, inter alia, that an insanity acquittee may not be held indefinitely on the sole ground that he cannot guarantee his continued remission. On January 12, 1983, the court denied without prejudice Thompson's motion for discharge or conditional release. The court ordered the administrator of Florida State Hospital, Chattahoochee,[15] to formulate and present within sixty days a plan providing twenty-four-hour daily custodial supervision. If no plan was forthcoming within that time, the court was to entertain "[Thompson's] argument for discharge on constitutional due process grounds." On March 22, 1983, Timothy Fjordbak, a clinical psychologist at Florida State Hospital, Chattahoochee, wrote to Judge Klein on behalf of the hospital administrator to advise the court that the HRS was unable to formulate a specific and detailed aftercare plan for treatment of Thompson in Dade County, Florida, due to the nonexistence of a twenty-four-hour daily custodial care facility.
On April 11, 1983, Drs. Reichenberg and Jaslow were again appointed to examine Thompson. Both doctors reported that Thompson was no longer in need of psychiatric hospitalization.
Hearings were held on May 5, 1983, and June 3, 1983, at which Judge Klein postponed ruling on a proposed release plan. *175 Finally, on June 14, 1983, the court announced that it would order the conditional release of Thompson pursuant to the Riverside House plan (see supra note 14) if, after one more examination of Thompson by Dr. Mutter, Dr. Mutter's opinion remained the same  that is, that Thompson no longer met the criteria for involuntary hospitalization. Dr. Mutter examined Thompson on June 21, 1983, and concluded that Thompson should be released. However, an order releasing Thompson to the custody of Riverside House was never entered.

D. Vacatur of the Acquittal
On July 6, 1983, a hearing was held before Judge Klein to rule on a local newspaper's motion to obtain access to the various psychiatric reports filed in this cause. At this hearing, Judge Klein sua sponte raised the issue of whether Judge Goderich lacked authority to enter the adjudication of not guilty by reason of insanity at the December 12, 1980 proceeding because Thompson was incompetent at that time. The court requested that the parties brief the issue. The state filed a memorandum on October 4, 1983, in which it argued that double jeopardy did not prevent the prosecution of Thompson because: (1) Thompson was incompetent at the December 12, 1980 proceeding, and (2) Thompson perpetrated a fraud on the court by feigning severe mental problems. On October 21, 1983, the state filed a "Motion to Vacate, on the Ground of Court Fraud, the Two Court Documents Entitled (1) `Order Adjudging Defendant Incompetent,' and (2) `Judgment of Acquittal by Reason of Insanity,' Which Documents were Signed and Filed on December 12, 1980." On January 5, 1984, Thompson filed a "Renewed Motion for Conditional Release with Supporting Statement of Facts and Memorandum of Law, Together with Response to State's Motion to Vacate Judgment of Acquittal and Order of Commitment." (This document is some 220 pages long. A 226-page corrected motion was filed on January 17, 1984.) The state filed a response in support of its motion to vacate on the ground of court fraud.
On February 10, 1984, Judge Klein ruled that Judge Goderich was without authority, power, or jurisdiction on December 12, 1980, to find Thompson not guilty by reason of insanity and enter a judgment of acquittal thereon. Judge Klein announced that he would enter a written order on February 23, 1984, at which time he would also rule on the state's motion to vacate the judgment of acquittal on the ground of fraud. Nevertheless, Judge Klein did not enter any written orders on February 23, 1984. Instead, Judge Klein began to hear testimony on the issue of fraud.[16] Thereupon, Thompson filed with this court a pleading titled "Alternative Petition for Writ of Habeas Corpus; and for Writ of Mandamus and for Stay of Proceedings, or, in the Alternative, Suggestion for Writ of *176 Prohibition." Thompson sought (1) the issuance of a writ of mandamus directing Judge Klein to enter a written order confirming his ore tenus motion of February 10, 1984, (2) a writ of prohibition directing Judge Klein to cease conducting further proceedings on the state's motion to vacate the judgment of acquittal and finding of not guilty by reason of insanity on the grounds that such proceedings were barred by the double jeopardy clause of the fifth amendment to the United States Constitution and article I, section 9, of the Constitution of the State of Florida, and (3) a writ of habeas corpus directing that Thompson be released from the Dade County Jail. After issuing an order to show cause, this court granted the state's motion to stay all proceedings on the petition until the hearings on the state's motion to vacate terminated. The hearings concluded on April 9, 1984.[17] The months of May, June, July, and August passed with no written order forthcoming from the trial court. On September 6, Thompson filed a "Renewed Alternative Petition for Writ of Habeas Corpus, and Writ of Mandamus." An order to show cause was issued, and, on October 10, 1984, the trial court entered a written order setting aside the December 12, 1980 judgment on two grounds: (1) the judgment was procured by fraud, and (2) Judge Goderich was without authority to enter the judgment because on that same date Thompson was adjudged incompetent. The trial court also adjudged Thompson to be competent to stand trial. Thompson did not appeal from this order but, instead, on November 1, 1984, filed a pleading titled "Amended Petition for Writ of Prohibition, Petition for Writ of Habeas Corpus, and Petition for Writ of Mandamus" which addresses the issues of fraud and the authority of the court to enter the judgment of acquittal.[18]

II. DOUBLE JEOPARDY
"Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that `[a] verdict of acquittal ... could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution.'" United States v. Martin Linen Supply Co., 430 U.S. 564, 571, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642, 651 (1977) (quoting United States v. Ball, 163 U.S. 662, 671, 16 S.Ct. 1192, 1195, 41 L.Ed. 300, 303 (1896)).
[T]he law attaches particular significance to an acquittal. To permit a second trial after an acquittal, however mistaken the acquittal may have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant so that "even though innocent he may be found guilty."
United States v. Scott, 437 U.S. 82, 91, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65, 74 (quoting Green v. United States, 355 U.S. 184, 188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204 (1957)), reh'g denied, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 197 (1978). Nevertheless, "an `acquittal' cannot be divorced from the *177 procedural context in which the action so characterized was taken." Serfass v. United States, 420 U.S. 377, 392, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265, 276 (1975). "[T]he trial judge's characterization of his own action cannot control the classification of the action." Scott, 437 U.S. at 96, 98 S.Ct. at 2196, 57 L.Ed.2d at 77 (quoting United States v. Jorn, 400 U.S. 470, 478 n. 7, 91 S.Ct. 547, 554 n. 7, 27 L.Ed.2d 543, 553 n. 7 (1971)). Specifically, "the word [acquittal] ... has no talismanic quality for purposes of the Double Jeopardy Clause." Serfass, 420 U.S. at 392, 95 S.Ct. at 1064, 43 L.Ed.2d at 276. "[I]t has no significance ... unless jeopardy has once attached and an accused has been subjected to the risk of conviction." Id., 420 U.S. at 392, 95 S.Ct. at 1065, 43 L.Ed.2d at 276. "Jeopardy denotes risk. In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution." Breed v. Jones, 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346, 354 (1975). "Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy." Serfass, 420 U.S. at 391-92, 95 S.Ct. at 1064, 43 L.Ed.2d at 276.
"The constitutional prohibition against `double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204 (1957). "[T]rial of the issue of guilt or innocence is the essence of jeopardy." United States v. Vaughan, 715 F.2d 1373, 1376 (9th Cir.1983). "[A] defendant is placed in jeopardy in a criminal proceeding once the defendant is put to trial before the trier of the facts, whether the trier be a jury or a judge." United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543, 553 (1971). "[J]eopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence." Martin Linen Supply Co., 430 U.S. at 569, 97 S.Ct. at 1353, 51 L.Ed.2d at 650.
Applying the above-stated legal principles pertaining to double jeopardy to the facts of this case, we conclude that jeopardy did not attach at the December 12, 1980 proceeding. Contrary to the trial court's characterization of the proceeding, it was neither in form nor in substance a trial. Furthermore, jeopardy did not attach because the trial court did not have the authority to find Thompson not guilty by reason of insanity.

A. The December 12, 1980 Proceeding Was Not a Trial
First, Thompson did not waive his right to a jury trial before or at the December 12, 1980 proceeding.
In United States v. Pecora, 484 F.2d 1289 (3d Cir.1973), the court held that the government could appeal from a dismissal of an indictment because jeopardy had not attached when the trial court considered the defendant's motion to dismiss. The court's holding was based upon its conclusion that the defendant had not waived his right to a jury trial. The court rejected the defendant's argument that, by entering into a stipulation of facts for the purpose of attacking the validity of the indictment, the defendant had "essentially waived" this right and held that, absent compliance with Federal Rule of Criminal Procedure 23(a), which requires that a waiver of jury trial be "in writing with the approval of the court and the consent of the government," there can be no such waiver. Pecora, 484 F.2d at 1293. The court stated: "Although the defendant normally argues that he has not waived a right, there is no reason to subvert a principle which protects defendants because in this particular case it would benefit him to have a less strict standard of waiver." Id.
In the instant case, neither a written waiver of jury trial, as required by Florida Rule of Criminal Procedure 3.260,[19] nor any other type of waiver appears in the record. Cf. Parks v. State, 263 So.2d 642 (Fla. 3d *178 DCA)(absence of compliance with statutory requirement that waiver be indicated and signed on the information not sufficient to require granting relief from conviction where the record otherwise reflects that defendant did in fact waive jury trial), cert. denied, 267 So.2d 834 (Fla. 1972). Further, because he was found to be incompetent at the time of the December 12, 1980 proceeding, Thompson could not have waived this right. See Alexander v. State, 380 So.2d 1188, 1190 (Fla. 5th DCA 1980). A waiver of jury trial must be made knowingly and voluntarily. See Dumas v. State, 439 So.2d 246 (Fla. 3d DCA 1983)(en banc), rev. denied, 462 So.2d 1105 (Fla. 1985). We decline to presume a waiver from the circumstances of this case. "This was to be a jury-tried case, and jeopardy could not attach until the jury was empaneled." United States v. Lasater, 535 F.2d 1041, 1047 (8th Cir.1976) (footnote omitted)(emphasis original). See also Collins v. State, 672 S.W.2d 588 (Tex. Ct. App. 1984) (where a valid and effective waiver of jury trial had not been executed as required by statute no valid determination of defendant's guilt or innocence was possible under Texas law and jeopardy did not attach at hearing on defendant's motion to assert defense of entrapment).
Second, Thompson was not at risk at the December 12, 1980 proceeding.
In Lockett v. Juviler, 65 N.Y.2d 182, 490 N.Y.S.2d 764, 480 N.E.2d 378 (1985), the defendant entered a plea of "not responsible by reason of mental disease or defect." The people consented to the plea on the basis of psychiatric reports which concluded that the defendant suffered from posttraumatic stress disorder resulting from his supposed Vietnam experience. The court accepted the plea. Shortly thereafter, the prosecutor learned that the defendant had never served in Vietnam as he had represented to the psychiatrists appointed to examine him. The people moved to vacate the plea on the ground that the people's consent thereto and its acceptance by the court were induced by fraud. On the issue of whether double jeopardy precluded the restoration of the criminal charges, the court stated:
Jeopardy cannot be said to have attached until the accused has been subjected to the risk of conviction.... In the case now before us, the petitioner never faced that risk during the plea proceedings. Under the statute governing this special plea ..., there were only two options available to the court. First, the court could accept the plea, thus terminating the criminal proceedings and initiating the civil commitment proceedings... . Second, the court could reject the petitioner's plea offer and permit the criminal proceedings to continue in the normal course. In no event could the court make a binding factual finding of the defendant's guilt. Therefore, the trial court correctly held that the double jeopardy clause does not preclude restoration of the criminal charges because jeopardy had not attached when the special plea was accepted.
Lockett, 65 N.Y.2d at 187, 490 N.Y.S.2d at 768, 480 N.E.2d at 382 (citations omitted).
Similarly, in State v. Rodrigues, ___ Hawaii ___, 679 P.2d 615 (1984), cert. denied, ___ U.S. ___, 105 S.Ct. 580, 83 L.Ed.2d 691 (1984),[20] the trial court granted the defendant's pretrial motion for judgment of acquittal on the ground of mental disease, disorder, or defect excluding responsibility, such motion having been filed pursuant to Hawaii statute. The state appealed from *179 the judgment of acquittal. The Supreme Court of Hawaii held that "the trial judge improperly weighed the testimony of the doctors, and acted as a trier of fact rather than a judge on the motion for acquittal." Rodrigues, 679 P.2d at 621. On the issue of whether double jeopardy prevented a trial from being held upon the vacation of the trial court's judgment, the court stated:
Here no jeopardy attached. This was a pretrial motion to determine whether defendant at the time of the offense charged was unable to appreciate the wrongfulness of his conduct or to control his conduct to the requirements of the law. There was no possibility of a conviction, and thus a trial is not barred by the double jeopardy clause of the Fifth Amendment.
Id. at 622. Accord State v. Hagerud, 174 Mont. 361, 570 P.2d 1131 (1977).
The procedure followed by the parties and the trial court in this case is essentially the "reverse guilty plea" procedure that is being used in New York. (As discussed below, such a procedure is not authorized in Florida.) The parties presented the trial court with two options on December 12, 1980  one, accept the stipulation and terminate the criminal proceedings, as it did; or two, reject the stipulation and permit the proceedings to continue in the normal course. The trial court accepted the stipulation after satisfying itself that there was a factual basis (the reports of the experts) for it.[21] The state was not attempting to convict Thompson on December 12, 1980, cf. People v. Deems, 81 Ill.2d 384, 43 Ill. Dec. 8, 410 N.E.2d 8 (1980) (where state attorney admitted in open court before "trial" that the defendant was innocent and during "trial" no prosecution evidence was introduced; the "trial" held by the court for the purpose of achieving the unauthorized result of a dismissal with prejudice in the guise of an acquittal was a "sham" and thus defendant never faced risk of determination of guilt and jeopardy did not attach), cert. denied, 450 U.S. 925, 101 S.Ct. 1378, 67 L.Ed.2d 355 (1981), and the court could not have made a binding factual finding that Thompson was sane at the time of the offenses. As a result, Thompson was not put "at risk" at the December 12, 1980 proceeding,[22] and no jeopardy attached.
Third, no evidence was introduced at the December 12, 1980 proceeding. Thus, even if the parties had come before the court on December 12, 1980, for a bench trial, jeopardy did not attach because the stipulation[23] was entered before any evidence was introduced. See Bernard v. State, 261 So.2d 133 (Fla. 1972) (jeopardy did not attach where no evidence was heard prior to time state entered nolle prosequi).

B. The Court Was Without Authority
In addition to the foregoing, the trial court was without authority to find Thompson not guilty by reason of insanity and enter a judgment of acquittal thereon. "[D]ouble jeopardy sanctions come to fruition only after the court properly acts in a manner within its jurisdiction and authority." State ex rel. Bludworth v. Kapner, 394 So.2d 541, 543 (Fla. 4th DCA 1981).
In Bludworth, the defendant filed a motion to dismiss the indictment or for a finding of not guilty by reason of insanity. After reviewing the reports and depositions *180 of the court-appointed experts, who had all concluded that the defendant was insane at the time of the alleged offense, the trial court entered an order finding the defendant not guilty by reason of insanity. Our sister court, treating the state's writ of prohibition as a writ of certiorari, granted certiorari, holding that the trial court did not have the authority to render the order under review. The court stated:
A basic and fundamental principle of our law is that it is the province of the trier of fact, after hearing all of the evidence and considering the applicable law, to determine whether a defendant is guilty or not guilty. The only exception to this principle is that a court sitting as trier of law, when called upon to determine the legal sufficiency of the evidence by a motion for judgment of acquittal, may enter a judgment of acquittal. Fla. R.Crim.P. 3.380. This may be done only "at the close of the evidence for the State or at the close of all the evidence in the cause... ." Fla.R.Crim.P. 3.380. Thus, in either event, the final determination is made only after there has been a trial, a proceeding in which both the State and defense are afforded an opportunity to present evidence and examine or cross examine witnesses. No such proceeding occurred in the instant case. Jury trial was not waived; the court was not sitting as the finder of fact.
Bludworth, 394 So.2d at 542.
Finding that the trial court acted without authority, the court concluded that jeopardy had not attached. But cf. State v. Foster, 438 So.2d 501 (Fla. 2d DCA 1983) (distinguishing Bludworth on the ground that the judgment of acquittal, although entered before the close of all the evidence for the state, occurred after the jury was sworn and empaneled; holding that the trial court, although in error, did not exceed its jurisdiction and authority and that jeopardy had attached).
"[A] defendant's mental condition at the time of the offense is a question of fact for the jury." Eason v. State, 421 So.2d 35, 37 (Fla. 3d DCA 1982). Where, as here, the defendant has not waived his right to jury trial, the court is without power or authority to decide a fact issue which amounts to a pretrial determination of guilt or innocence. See United States v. Linetsky, 533 F.2d 192 (5th Cir.), reh'g en banc denied, 540 F.2d 1086 (5th Cir.1976); see also Serfass, 420 U.S. at 389, 95 S.Ct. at 1063, 43 L.Ed.2d at 274; United States v. Mann, 517 F.2d 259, 266 (5th Cir.1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).
We further conclude that the trial court lacked authority to find Thompson not guilty by reason of insanity because Thompson was considered to be, and, in fact, was found to be, incompetent at the time said finding was made. Florida Rule of Criminal Procedure 3.210, in effect on December 12, 1980, provides:
(a) A person accused of a crime who is mentally incompetent to stand trial shall not be proceeded against while he is incompetent.
(b) If before or during the trial the court of its own motion, or upon motion of counsel for the defendant or for the State, has reasonable ground to believe that the defendant is not mentally competent to stand trial, the court shall immediately enter its order setting a time for a hearing to determine the defendant's mental condition, which shall be held no later than 20 days after the date of the filing of the motion, and shall order the defendant to be examined by no more than three nor fewer than two experts prior to the date of said hearing. (Emphasis supplied.)
The record establishes unequivocally that at the time of the proceeding on December 12, 1980, the trial judge, the state, and defense counsel believed that Thompson was incompetent to stand trial. The court had been informed by defense counsel at arraignment that Thompson had been determined incompetent by the federal district court in 1978,[24] and, in addition, all the experts, with the exception of Dr. Graff, *181 had reported that Thompson was incompetent to stand trial. Moreover, before the court made the finding that Thompson was not guilty by reason of insanity, the state had stipulated that Thompson was incompetent to stand trial. In accordance with Florida Rule of Criminal Procedure 3.210(b), the trial court was required to determine whether Thompson was mentally competent to be proceeded against before allowing the prosecution to continue. Upon a finding that Thompson lacked such capacity, Florida Rule of Criminal Procedure 3.210(a) required that the prosecution be abated. Rule 3.212, in effect on December 12, 1980, provides:
(a) The court shall first consider the issue of the defendant's competence to stand trial. If the court finds the defendant competent to stand trial, the court shall enter its order so finding and shall proceed to trial.
(b) If, at the hearing, the court determines that the defendant is not mentally competent to stand trial, the court shall consider the issue of involuntary hospitalization of the defendant if examination into that issue has been previously ordered. (Emphasis supplied.)
At the competency hearing required by rule 3.210, the trial court is to consider, pursuant to rule 3.212, only whether the defendant is competent to stand trial and, if it is determined that the defendant is not competent to stand trial (as happened in this case), whether the defendant meets the criteria for involuntary hospitalization. The court is not to consider whether the defendant was insane at the time of the offense.
In State v. Brown, 307 So.2d 896 (Fla. 1st DCA), cert. denied, 317 So.2d 80 (Fla. 1975), the court held that it was error for the trial court to enter a judgment of not guilty by reason of insanity at a pretrial hearing and "short circui[t] [the] provision of [Florida Rule of Criminal Procedure 3.210] directing that he commit [the defendant] to the Division of Mental Health under said § 394.467." Brown, 307 So.2d at 897. Under the Florida Rules of Criminal Procedure in effect at that time, an order adjudging the defendant not guilty by reason of insanity was authorized, but only after the defendant had been committed and it was determined that "there [was] no substantial probability that the defendant [would] become mentally competent to stand trial within the foreseeable future or ... that no progress [was] being made toward that goal... ." Fla.R.Crim.P. 3.210(a)(5). Rule 3.213, in effect on December 12, 1980,[25] provides:
(b) If at any time after five years after determining a person incompetent to stand trial when charged with a felony or one year when charged with a misdemeanor, the court, after hearing, determines that the defendant remains incompetent to stand trial, that there is no substantial probability that the defendant will become mentally competent to stand trial in the foreseeable future and that the defendant does meet the criteria for involuntary hospitalization set forth by law, the court shall dismiss the charges against the defendant. ... (Emphasis supplied.)
At the December 12, 1980 proceeding, the trial court not only "short-circuited" the Florida Rules of Criminal Procedure, but also entered an order not authorized by the rules.[26] The parties could not by stipulation *182 enlarge the power or authority of the trial court. Cf. Economy Cash & Carry Cleaners, Inc. v. Cleaning, Dyeing & Pressing Board, 128 Fla. 408, 174 So. 829 (1937) (parties' stipulation could not confine court to consideration of constitutional question where court bound by rule that constitutional questions are not to be reached if case can be disposed of on other grounds). We conclude, therefore, that no jeopardy attached. Cf. Cox v. State, 412 So.2d 354 (Fla. 1982) (where, in contravention of Florida Rule of Criminal Procedure 3.170(g), trial court accepted defendant's plea to lesser offense over the objection of the prosecuting attorney, it acted without jurisdiction and authority and jeopardy did not attach); Vinson v. State, 345 So.2d 711 (Fla. 1977) (trial court was without authority to consider guilt or innocence and no jeopardy attached where, upon review of the factual basis for a nolo contendere plea, the court became convinced that the underlying facts did not establish defendant's guilt and entered judgment of not guilty); State v. Sherrod, 383 So.2d 752 (Fla. 4th DCA 1980) (no jeopardy attached where, after two trials resulted in mistrial, trial court sua sponte entered an order in the nature of an acquittal dismissing the charges with prejudice; upon jury's failure to reach verdict, court should have declared a mistrial, discharged the jury, and set the case for retrial in accordance with Florida Rule of Criminal Procedure 3.560(b)).
Our conclusion that there is no double jeopardy bar to this prosecution does not end our inquiry. Thompson has raised other doctrines which he contends bar the prosecution.

III. COLLATERAL ESTOPPEL AND RES JUDICATA
Thompson contends that collateral estoppel bars the state from relitigating the issue of his insanity at the time of the offenses. However, because the proposed "relitigation" of the issue is to occur in the context of the very same cause of action in which the issue has been previously addressed, Thompson's contention is more properly considered as invoking the doctrine of res judicata.[27],[28]
"[T]he doctrine of res judicata is just as applicable to judgments in criminal prosecutions as to those in civil cases... ." Busbee v. State, 183 So.2d 27, 29 (Fla. 1st DCA), cert. denied, 192 So.2d 486 (Fla. 1966). "Accordingly, matters directly determined by a criminal court of competent jurisdiction cannot subsequently be disputed by the same parties." State v. Dwyer, 317 So.2d 149, 151 (Fla. 2d DCA 1975) (emphasis supplied). While the doctrine of res judicata is often lost in the broader doctrine of former jeopardy, Busbee, 183 So.2d at 29, the former doctrine may be implicated where the latter is not.[29]
Although double jeopardy does not require a final judgment, finality is a prerequisite for the doctrine of res judicata. Linetsky, 533 F.2d at 198 n. 5. "[W]ithout a valid subsisting decision in an early stage of the same suit or a final decree or judgment *183 entered in a former action there is no foundation for invocation of the doctrine of res adjudicata or the principle of estoppel by judgment." Gordon v. Gordon, 59 So.2d 40, 41 (Fla.), cert. denied, 344 U.S. 878, 73 S.Ct. 165, 97 L.Ed. 680 (1952). See generally 32 Fla.Jur.2d Judgments and Decrees § 146 (1981). In the instant case, the judgment of acquittal entered on December 12, 1980, was vacated on the grounds of fraud and that the court lacked authority to enter it. If the judgment was properly vacated, no res judicata bar exists to prevent the further prosecution of Thompson.[30]

A. Fraud
The trial court relied upon State v. Burton, 314 So.2d 136 (Fla. 1975), in reaching its conclusion that it had the inherent power to set aside the judgment of acquittal rendered on December 12, 1980. While we agree that, as a general proposition, a criminal trial court has the inherent power to set aside orders and judgments on the ground of fraud, we find Burton to be distinguishable on its facts and that the fraud involved in this case did not constitute a proper ground to set aside the judgment of acquittal.
In Burton, the defendant moved for a new trial after being convicted of manslaughter. The motion was predicated on alleged new and material evidence. The trial court granted the motion based wholly upon the sworn facts set forth in the affidavit. After the state moved to set aside the order granting the new trial and a hearing was held, the court set aside its order, finding that the facts disclosed in the affidavit were basically false and that such false statements constituted a fraud on the court. The district court reversed, and the supreme court vacated the decision of the district court, holding that a criminal court, like a civil court, has the inherent power to vacate, modify, open, or otherwise act upon, at any time, orders, judgments, or decrees which are the product of fraud.
The state's position is that Thompson's conduct constituted a "fraud on the court" and that under Burton the trial court properly vacated the judgment of acquittal. While "`fraud on the court' is a somewhat elusive concept ...," Alexander v. First National Bank of Titusville, 275 So.2d 272, 274 (Fla. 4th DCA 1973), it has been established that "only extrinsic fraud may constitute fraud on the court." DeClaire v. Yohanan, 453 So.2d 375, 377 (Fla. 1984). "Extrinsic fraud involves conduct which is collateral to the issues tried in a case and occurs when an unsuccessful party has somehow been prevented from participating in a cause." Gomez v. Espinosa, 466 So.2d 1201, 1204 (Fla. 3d DCA 1985); see also DeClaire, 453 So.2d at 377. Thompson's fraudulent conduct did not prevent the state from participating in the cause and, thus, it did not constitute either extrinsic fraud or fraud on the court.
In DeClaire, the supreme court held that the husband's filing of a false financial affidavit in a dissolution action constituted intrinsic fraud and thus did not constitute a sufficient ground for setting aside a property settlement agreement approved in the final judgment of dissolution. The court stated:
It is clear that the false financial affidavits submitted by the petitioner-husband were part of the record in this case. The issue of the husband's net worth was, therefore, a matter before the court for resolution and could have been tried. There were multiple proceedings in this cause before and after the entry of the final judgment. In addition, the trial judge found that the respondent-wife had information which should have given her notice of the falsity of the husband's financial information. In our view, this conduct is intrinsic fraud and the trial judge correctly determined that there was no fraud on the court in this case.
453 So.2d at 380 (emphasis supplied). The court defined intrinsic fraud as "fraudulent conduct that arises within a proceeding and *184 pertains to the issues in the case that have been tried or could have been tried." Id. at 377.
While it is difficult to distinguish the nature of the fraud found in Burton from that found in DeClaire, we note that DeClaire involved an attack on a final judgment and not an attack on a post-judgment order. Although an order granting a new trial confers a substantive right and is not interlocutory in nature, see Huffman v. Little, 341 So.2d 268 (Fla. 2d DCA 1977) (in the absence of fraud or clerical error, once motion for new trial is determined, it does not remain subject to modification); see also Salkay v. State Farm Mutual Automobile Co., 398 So.2d 916 (Fla. 3d DCA) (same), rev. denied, 402 So.2d 612 (Fla. 1981), such an order is not entitled to the same protection as a final judgment. See DeClaire, 453 So.2d at 380 ("[T]he grounds upon which a final judgment may be set aside, other than by appeal, are limited in order to allow the parties and the public to rely on duly entered final judgments."). Moreover, it would be nonsensical to hold that a trial court cannot set aside an order granting a new trial where, as in Burton, the whole basis for granting a new trial (newly discovered evidence) does not, in fact, exist.[31]
Like DeClaire and unlike Burton, the instant case involves an attack on a final judgment (or what purports to be a final judgment).[32] It cannot be contended that a final judgment in a criminal action deserves any less protection than a final judgment in a civil action.
The issue of whether Thompson was feigning a mental illness or defect was intrinsic to (necessarily decided upon resolution of) the general question of whether Thompson was insane at the time of the offenses. The fraud committed by Thompson was the concealment of his true condition. Thompson "lied" to the court both directly at court appearances and indirectly through the court-appointed experts[33] and an officer of the court (defense counsel).[34] Like perjury, this conduct constitutes intrinsic fraud, see DeClaire, 453 So.2d at 380, and cannot serve as a basis for setting aside a judgment.[35]See Truitt v. Truitt, 383 So.2d 276 (Fla. 5th DCA 1980). Additionally, the state was on notice that Thompson was possibly malingering before it stipulated to his insanity at the time of the offenses. Cf. State v. Matera, 266 So.2d 661 (Fla. 1972) (where matter forming the basis of a motion to vacate known to defendant at time of trial, it will not support a collateral attack on judgment of conviction); Burau v. State, 353 So.2d 1183 (Fla. 3d DCA 1977) (same).
Based on the foregoing analysis, we conclude that Thompson's fraudulent conduct constituted intrinsic fraud and cannot serve as a basis for holding that the trial court's finding of not guilty by reason of insanity and the judgment of acquittal were void.

*185 B. Lack of Authority
Although the first basis for the trial court's order of vacatur was inadequate, the trial court correctly determined that and the judgment of acquittal thereon were entered without authority and that such fact constituted a sufficient basis for vacatur.
In Vinson v. State, 345 So.2d 711 (Fla. 1977), the defendant entered a plea of nolo contendere. Over the state's objection, the trial judge ordered an evidentiary hearing on the plea and proceeded to receive exhibits into evidence and hear witnesses. Several weeks later, the trial judge entered an order finding the defendant not guilty of the charges. The supreme court, approving the decision of the district court (reported at 320 So.2d 50 (Fla. 2d DCA 1975)), held that the trial court lacked the authority to find the defendant not guilty. The court stated:
In summary, we hold that the decision of the trial court discharging the defendant was without authority or jurisdiction and is a nullity. The choices of the trial court under Rule 3.170 and the facts of this case were: (1) to accept the plea and enter judgment and sentence thereon or (2) to reject the plea, enter a plea of not guilty for the defendant after which the defendant would have a choice of entering a plea of guilty or not guilty and then proceeding with the trial.
Vinson, 345 So.2d at 717 (emphasis supplied).
Under Florida Rule of Criminal Procedure 3.380, a trial court does not have the authority to enter a judgment of acquittal before trial has begun. Bludworth. Consistent with Vinson, we hold that the trial court's attempt to do otherwise was a nullity or void ab initio. The instant case is to be distinguished from cases where the court has jurisdiction to make a decision but errs in the exercise thereof. Cf. Rodriguez v. State, 441 So.2d 1129 (Fla. 3d DCA 1983) (on rehearing en banc) (where court has jurisdiction to impose sentence but imposes an unlawful sentence, sentence imposed, while unauthorized, is not void), rev. denied, 451 So.2d 850 (Fla. 1984); King v. State, 373 So.2d 78 (Fla. 3d DCA 1979) (same), cert. denied, 383 So.2d 1197 (Fla. 1980). In this regard, the instant case is more like Solomon v. State, 341 So.2d 537 (Fla. 2d DCA 1977) (order placing defendant on probation, which was imposed during term subsequent to one in which original sentence was entered, contravened Florida Rule of Criminal Procedure 3.800 and was, therefore, void for lack of jurisdiction), than either Rodriguez or King. In the latter two cases, where it was held that the defendant waived any error, the trial court had the authority or jurisdiction to make a sentencing decision but erred in so doing by imposing an unauthorized sentence. In Solomon, on the other hand, the trial court did not have jurisdiction to impose a sentence (illegal or otherwise), and the trial court's order was held to be void.

C. The Defendant's Incompetence
Additionally, because Thompson was found incompetent at the December 12, 1980 proceeding, the finding of not guilty by reason of insanity and the judgment entered thereon were "absolutely void." Flynn v. United States, 217 F.2d 29, 30 (9th Cir.1954), cert. denied, 348 U.S. 930, 75 S.Ct. 344, 99 L.Ed. 729, petition for reh'g and motion to vacate dismissed, 222 F.2d 541 (9th Cir.1955).
In Flynn, the defendant was tried by a jury and convicted. Prior to sentencing, it was determined that the defendant had been incompetent to stand trial. The trial judge vacated the conviction and the defendant was retried and again convicted. On appeal, the defendant argued that he had been placed in double jeopardy. The appellate court held:
There is no defect in this case. The theory of counsel is that appellant has been placed in double jeopardy. But the Trial Court found Flynn was incompetent on his first trial and vacated the judgment of conviction. This formal act was proper and fit, but it was not a necessity. The proceeding was absolutely void and *186 every court would hold it so. The statutes and rules of procedure cannot give vitality to a judgment coram non judice. This is the inherent nature of the court which does not depend upon the written word. If a defendant is not able to understand the proceedings against him and the nature of the crime with which he is charged, he is not present in court even though his body be there. No trial could be held or judgment pronounced against him under the circumstances.

* * * * * *
In the case at bar, the statute did not cover the circumstances and the Court had inherent power to vacate the judgment and retry the defendant when competent.
Flynn, 217 F.2d at 30 (emphasis supplied). Cf. United States v. Levy, 232 F. Supp. 661 (N.D.Fla. 1964) (where mistrial declared after defense counsel suggested that defendant was mentally incompetent, double jeopardy did not prevent subsequent trial because court was presented with "urgent necessity" in that any purported effort to try an incompetent person is void ab initio).
We are not unmindful that the purpose of the common-law rule and Florida Rule of Criminal Procedure 3.210(a)  that a person is not to be proceeded against while incompetent  "is to insure that all persons who must defend themselves in the criminal arena are mentally capable of assisting in the conduct of that defense." Hayes v. State, 343 So.2d 672, 673 (Fla. 2d DCA 1977). This rule protects the accused's due process right to a fair trial, see Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); Scott v. State, 420 So.2d 595 (Fla. 1982); see also Weber v. State, 438 So.2d 982 (Fla. 3d DCA 1983) (failure of trial court to conduct formal competency hearing constituted denial of due process where reasonable grounds existed to believe defendant was not competent to stand trial), and, ordinarily, the state would have no standing to raise the issue. Here, however, the competency issue was, in fact, raised by the defendant, and he was found to be incompetent at the December 12, 1980 proceeding. The defendant will not be heard to complain that the focal point of the proceedings below leading up to his "acquittal" is now being considered by this court.[36]

IV. ESTOPPEL
Thompson argues that the state is estopped to deny the validity of the court's finding of not guilty by reason of insanity and the judgment of acquittal predicated thereon. Thompson relies principally on State v. LeBeouf, 448 So.2d 232 (La. Ct. App. 1984). In LeBeouf, the defendant pled not guilty and not guilty by reason of insanity to second-degree murder. The prosecution accepted the latter plea based on the reports of the examining doctors, and the trial judge, after reciting portions of a statute which provided for the possible commitment of a felon found not guilty by reason of insanity, set the matter for a "contradictory" hearing. LeBeouf was found dangerous to himself and others and ordered committed until safe. Eight years later, LeBeouf was ordered to be released. The state sought to try LeBeouf, urging the appellate court that the trial court was without authority to find the defendant not guilty by reason of insanity. The court stated:
We note that the trial court did not find LeBeouf guilty or not guilty. Rather, the State stipulated that LeBeouf was not guilty by reason of insanity and the court did not sentence LeBeouf but ordered him incarcerated for treatment. We cannot permit the State to agree to a plea bargain, allow the defendant to face and endure nine years of conviction consequences, and then deny the plea bargain. The State's arguments are, at *187 best, disingenuous and the State is estopped to deny its own agreement.
LeBeouf, 448 So.2d at 235 (emphasis supplied). Cf. State v. Hightower, 101 Idaho 749, 620 P.2d 783 (1980) (state barred from making belated constitutional challenge to statute which permits an acquittal on grounds of mental disease or defect excluding responsibility without a jury trial where it acquiesced to procedure leading to entry of judgment of acquittal and in the involuntary commitment of defendant, which, under statute, necessarily followed, and destroyed all physical evidence in the case; defendant competent at the time entry of judgment of acquittal took place).
There was no plea bargain in the instant case. The only plea of record was the plea of not guilty which was entered by the trial court at arraignment. Further, the record is devoid of any evidence of negotiations between the state and the defense which would establish the existence of a bargain. The state did not stipulate to Thompson's insanity at the time of the offenses as a result of receiving some consideration from Thompson. Moreover, unlike in LeBeouf, where the defendant was found to be "sane" before his plea was accepted, Thompson was found incompetent on December 12, 1980, and, in the absence of the state's stipulation as to his insanity at the time of the offenses, would have been committed in any event.[37] No detrimental reliance is presented under these facts, and, therefore, an estoppel will not lie. See generally 22 Fla.Jur.2d Estoppel and Waiver §§ 54-56 (1980).

V. CONCLUSION
There is no double jeopardy bar or any other bar to Thompson's prosecution. We have considered the other issues raised by Thompson and conclude that they are without merit. For the foregoing reasons, the alternative petitions for habeas corpus, prohibition, and mandamus are denied, and this cause is remanded for trial on the merits.
NOTES
[1] Two co-defendants were indicted along with Thompson. One pled guilty and received concurrent life sentences on all twelve counts. The other was tried by a jury, convicted of all twelve counts, and sentenced to death. The details of the crimes are recited in Bolender v. State, 422 So.2d 833 (Fla. 1982), cert. denied, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315, reh'g denied, 462 U.S. 1146, 103 S.Ct. 3131, 77 L.Ed.2d 1380 (1983).
[2] On February 17, 1978, Thompson was found unconscious in a shower stall while being held in a federal prison (Federal Correctional Institution, Miami, Florida) awaiting trial. Thompson allegedly had inhaled fumes from a sealer that was being applied to the ceramic tile. No application tools were discovered in the immediate area where Thompson was found unconscious. It was the opinion of the prison officials that Thompson had been sniffing the solvent. Thompson was revived and his vital signs were tested and found to be within normal limits; nevertheless, Thompson continued to act as if in a stupor. Pursuant to his attorney's motion and a report from a Dr. Jaslow, Thompson received psychiatric evaluation for several months at a federal facility (Federal Correctional Institution, Lexington, Kentucky). The chief psychiatrist at the facility concluded that Thompson was incompetent to stand trial because he suffered from permanent and irreversible organic brain syndrome due to the fume incident. In December, 1978, the United States District Court for the Southern District of Florida granted Thompson's motion to dismiss the federal charges. The motion was based upon the conclusion that Thompson would not become competent in the foreseeable future and upon the dictates of Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).
[3] Under the facts of this case, we need not, and do not, decide whether the federal district court's order dismissing the federal charges on the unstated basis that Thompson was incompetent (which was entered over one year prior to Thompson's arraignment on the state charges) created a presumption that Thompson was incompetent to stand trial in this state proceeding. Cf. Alexander v. State, 380 So.2d 1188, 1190 (Fla. 5th DCA 1980) (defendant who was adjudged incompetent by Florida court presumed to continue to be incompetent for purpose of Florida criminal proceeding until declared sui juris by the court).
[4] Dr. Jaslow's opinion that Thompson was "marginally" competent at the time of the alleged offenses was based upon the doctor's assessment of Thompson's alleged behavior during the commission of the criminal acts which, according to Dr. Jaslow, indicated that Thompson "was at least capable of following the proper procedures that may have been spelled out to him by others, or at least to follow their examples."
[5] On February 19, 1980, Judge Fuller was of the opinion that Jackson Memorial Hospital did not have the facilities to evaluate Thompson pursuant to Dr. Graff's recommendations and suggested that Thompson instead be sent to South Florida State Hospital [South Florida]. Judge Fuller entered an order to have the Department of Health and Rehabilitative Services [HRS] retain custody of Thompson for the purpose of a 30-day psychiatric evaluation. The state reported that South Florida could not accept Thompson because it was operating under an injunction which prohibited it from accepting additional patients due to overcrowding.
[6] See supra note 5.
[7] At the hearing on this date, defense counsel (Mr. Kessler) argued that the court had "no alternative but to continue the finding of insanity by the United States District Court Judge Hoeveler and send him to South Florida pursuant to the Baker Act." The following colloquy then took place:

MR. LAESER [Prosecutor]: If I can make one response to Mr. Kessler's statement, I think the issue of sanity is really an issue for the trier of fact even assuming, and the State does agree there was a prior adjudication of insanity, that does not mean that we cannot rebut that at the time of trial by competent evidence.
I think that it is always a question for the trier of fact since we are not at a point where Mr. Thompson is competent to be present before the trier of fact in terms of his ability to assist counsel or to participate in the trial procedure.
I think we are essentially putting the cart before the horse when we are talking about insanity.
Now, the issue is present competency.
MR. KESSLER: We agree with the State. The State is absolutely correct except that the State has vacillated on this particular issue by failing to provide adequate treatment facilities and/or evaluation facilities for Mr. Thompson. That is all. (Emphasis supplied.)
[8] The prior examinations were seven months old at this time.
[9] Judge Goderich had replaced Judge Fuller on July 11, 1980, upon Judge Fuller's retirement. Judge Fuller has subsequently returned to the circuit bench and serves in the civil division.
[10] The proceeding was described by the court reporter as "sentencing proceedings."
[11] In light of the detective's interview with Gearing and Dr. Graff's reports, the fact that none of the experts reported that Thompson was insane at the time of the offenses, the inherent reliability problems with psychiatric diagnosis, see Nesbitt v. Community Health of South Dade, Inc., 467 So.2d 711, 716 (Fla. 3d DCA 1985) (Jorgenson, J., concurring in part, dissenting in part), and authorities cited therein, and the fact that the state had at least five years under Florida Rule of Criminal Procedure 3.213 to determine whether Thompson was malingering, the state's action in stipulating to Thompson's insanity at the time of the offenses is inexplicable. The issue regarding the sanity of an accused is one that should be left to a jury and should rarely be decided by a trial judge (on a motion for judgment of acquittal or otherwise). As the Supreme Court stated in regard to standards for appellate reversal on grounds of insufficient evidence of an accused's sanity at the time of the offense:

When the basic issue before the appellate court concerns the sufficiency of the Government's proof of a defendant's sanity (as it did here), a reviewing court should be most wary of disturbing the jury verdict:
"There may be cases where the facts adduced as to the existence and impact of an accused's mental condition may be so overwhelming as to require a judge to conclude that no reasonable juror could entertain a reasonable doubt. But in view of the complicated nature of the decision to be made  intertwining moral, legal, and medical judgments  it will require an unusually strong showing to induce us to reverse a conviction because the judge left the critical issue of criminal responsibility with the jury."
Burks v. United States, 437 U.S. 1, 17 n. 11, 98 S.Ct. 2141, 2150 n. 11, 57 L.Ed.2d 1, 13 n. 11 (1978) (quoting King v. United States, 372 F.2d 383, 389 (D.C. Cir.1967) (as amended)).
[12] The orders appointing disinterested qualified experts provided that the experts were to examine Thompson and give their opinion (1) as to the "mental condition of [Thompson];" (2) as to Thompson's present capacity "to properly answer charges against him and aid in his own defense and stand trial;" (3) as to "whether, at the time of the alleged offense[s] ..., [Thompson] knew right from wrong and knew the nature and consequences of his acts;" and (4) as to "whether [Thompson] should be accorded psychiatric treatment and, if so, recommendations as to what type of treatment."
[13] Dr. Jaslow noted in his report: "It is still difficult to give a valid opinion concerning his mental state at the time of the alleged offense, although this doesn't seem to be a necessary consideration at this time since he apparently was found Not Guilty by Reason of Insanity... ." Dr. Jaslow did not opine that Thompson must have been feigning mental problems back in 1980 but, instead, noted that Thompson "seems to have improved considerably since he has discontinued the use of various psychotropic medications."
[14] The hospital staff and Dr. Mutter had recommended Riverside House, a residential outpatient halfway house which was willing to accept Thompson for supervision of his conditioned release.
[15] Thompson had been transferred to Chattahoochee from South Florida on August 17, 1982, after South Florida had been ordered closed by the legislature and the HRS.
[16] The state produced Gearing, who had been located in June, 1983, while serving time at a correctional institution in Columbus, Ohio. Gearing testified that he met Thompson in May, 1979, while both he and Thompson were serving time at Union Correctional Institution, Raiford, Florida (Thompson had been transferred to Raiford, after the federal charges were dismissed, to finish serving a sentence imposed upon a state criminal conviction), and that Thompson told him that he (Thompson) had manipulated the doctors at the federal facility. Gearing further testified that, while serving as chief law clerk in the prison, he had researched the subject of insanity as a criminal defense by reviewing trial records, including psychiatric reports, from cases which involved the insanity defense and by reading textbooks on the subject, and that he shared his research with Thompson and discussed with Thompson the types of symptoms that could be demonstrated to show psychiatric illness or defect. When asked to describe the symptoms which were discussed, Gearing answered:

Lapse of memory, motor reflex problems, the inability to remember an individual's name, facial contortions, the tongue hanging out, things like that. Things that were definitely out of the norm.
When we would go through these things, it was almost comical because we knew it was out of character for Paul to be doing this, but at the time, it was developing a facade that might be needed in the future.
Additionally, Gearing testified that he and Thompson and a number of other inmates would play "insanity defense" games where inmates would take turns playing the role of judge, prosecutor, defense attorney, or doctor.
[17] Among the various witnesses testifying at these hearings were Dr. Schinger, a neurologist, who concluded, based on his reading of the various reports, particularly the fact that a normal EEG (electroencephalogram) reading was recorded immediately after the fume incident, that there was a 99.8% chance Thompson had been feigning back in 1980; Dr. Reichenberg, who concluded with 100% certainty that Thompson had been feigning; and Dr. Mutter, who concluded that there was a 90% chance Thompson had been feigning. Also testifying was Thompson's parole officer who had been assigned to Thompson's case in November, 1979. She testified that Thompson did not exhibit any memory problems or difficulty in understanding, but, instead, was lucid and coherent. In fact, Thompson had obtained a job which required him to drive a car.
[18] Thompson had a right to appeal the order vacating the judgment of acquittal. See Fla.R. App.P. 9.140(b)(1)(C). Thompson's amended petition was filed within thirty days of the rendition of such order, see Fla.R.App.P. 9.140(b)(2), and, consistent with Florida Rule of Appellate Procedure 9.040(c), we treat his amended petition, in part, as an appeal from that order. With regard to the double jeopardy issue, prohibition is an appropriate remedy to pursue in order to prevent the occurrence of a double jeopardy violation. See Strawn v. State ex rel. Anderberg, 332 So.2d 601, 602 (Fla. 1976).
[19] Florida Rule of Criminal Procedure 3.260, in effect on December 12, 1980, provides: "A defendant may in writing waive a jury trial with the consent of the State."
[20] Justice Brennan, with whom Justice Marshall joined, dissented from the denial of certiorari. In his dissenting opinion, Justice Brennan opined that the Hawaii court's reliance upon Serfass was misplaced because Serfass involved the dismissal of an indictment on grounds unrelated to a resolution of the factual elements of the crime. Justice Brennan concluded that, because the issue of "whether jeopardy attaches to an acquittal based upon a resolution of a factual element of the crime that occurred prior to the empanelling of a jury or the calling of the first witness" had yet to be addressed by the Court and because this issue was of "some importance," plenary consideration was appropriate. Rodrigues, ___ U.S. at ___, 105 S.Ct. at 581-82, 83 L.Ed.2d at 692-93 (emphasis original).
[21] To this extent, Judge Goderich followed the procedure for accepting guilty or nolo contendere pleas under Florida Rule of Criminal Procedure 3.172(a) (in effect on December 12, 1980), which provides: "Before accepting a plea of guilty or nolo contendere the trial judge shall satisfy himself that the plea is voluntarily entered and that there is a factual basis for it. Counsel for the prosecution and the defense shall assist the trial judge in this function."
[22] Indeed, defense counsel admitted as much in his renewed motion for conditional release or discharge:

Harking back to the "Lady and the Tiger" analogy there is no tiger (conviction), there is only one door, and it stands wide open with his true love (acquittal) framed in the doorway. He [Thompson] did not have to make a choice, nor was there a risk of conviction. There was, instead, an agreed stipulated verdict of acquittal. (Emphasis supplied.)
[23] The stipulation was to the issue and not to the underlying facts.
[24] See supra note 3.
[25] The rule was adopted on July 18, 1980, and became effective on July 1, 1980. In Re Rules of Criminal Procedure, 389 So.2d 610 (Fla. 1980).
[26] Thompson's reliance upon Florida Rule of Criminal Procedure 3.217 to support his contention that Judge Goderich had the power to acquit under these circumstances is misplaced. Subsection (a) provides: "When a person tried for an offense shall be acquitted for the cause of insanity by the jury or the court, the jury or judge in giving the verdict or finding of not guilty shall state that it was given for such cause." (Emphasis supplied.) While this subsection does refer to acquittals by the jury or the court, such acquittals are to be entered only after defendants have been tried. Thompson's contention that subsection (b) of the rule indicates that a defendant may be found not guilty by reason of insanity and adjudged to be incompetent at the same proceeding is erroneous. This subsection allows for the commitment of an insanity acquittee who meets the criteria for involuntary hospitalization; it does not provide for a nunc pro tunc hearing to determine a defendant's competency to stand trial. A defendant may be competent to stand trial and yet meet the criteria for involuntary hospitalization.
[27] "Res judicata ... applies only to a second suit between the same parties based on the same cause of action. ... In this regard, it differs from collateral estoppel which does not require the same cause of action, but requires the same parties and issues." State v. Carter, 452 So.2d 1137, 1139 (Fla. 5th DCA 1984) (citation omitted) (emphasis original).
[28] In State v. McCord, 402 So.2d 1147 (Fla. 1981), the supreme court held that collateral estoppel in a criminal case is part of the fifth amendment guarantee against double jeopardy and that the doctrine does not apply unless jeopardy has attached in the first proceeding.
[29] The doctrine of res judicata has been held to be applicable, at least in dicta, to pretrial dismissals without prejudice "where, upon the refiling of the information, the trial court is confronted with the identical motion to dismiss together with the identical traverse or demurrer, or lack thereof, as the court was previously confronted with when it dismissed the first information." Carter, 452 So.2d at 1139; see also State v. Gellis, 375 So.2d 885, 886 (Fla. 3d DCA 1979) (same).
[30] To constitute a sufficient basis for vacatur the infirmity must render the judgment void not merely voidable. See generally 33 Fla.Jur.2d Judgments and Decrees §§ 322-24 (1982).
[31] As the court stated in Burton:

The trial court said it would not have acted as it did in granting a new trial had the truth been presented to him. Must the fact that he acted on false testimony render him helpless to remedy the wrong which has occurred and to put justice back on the track?
314 So.2d at 138 (emphasis supplied).
[32] Burton was found to be controlling in State v. Crews, 477 So.2d 984 (Fla. 1985). In Crews, the supreme court held that the trial court had the authority to entertain a second motion for post-conviction relief where the testimony produced at the original hearing for post-conviction relief was found to have been false.
[33] Florida Rule of Criminal Procedure 3.216(h), in effect on December 12, 1980, provides in part: "The experts appointed by the court may be summoned to testify at the trial, and shall be deemed court witnesses whether called by the court or either party." (Emphasis supplied.)
[34] Defense counsel, who apparently was also fooled by Thompson, represented to the court that Thompson was so incompetent to stand trial that he did not even know who his attorney was.
[35] An exception to the rule that perjury cannot serve as a basis for setting aside a judgment is that a defendant may attack a conviction where "the perjured testimony formed the basis of the conviction, was knowingly used by the prosecution and was unknown to defendant at the time of trial or during appeal." State v. Matera, 266 So.2d 661, 663 (Fla. 1972) (footnote omitted).
[36] In this regard, we think it is important that Thompson was acquitted without being subjected to the risk of conviction. This would be a far different case had Thompson gone to trial, been acquitted, and, thereafter, the state had raised the issue of Thompson's competency to stand trial.
[37] Of course, the fact that Thompson was found incompetent to stand trial did not necessarily mean that he would also be found to meet the criteria for involuntary hospitalization. However, the existence of such fact did provide the court with a basis for exercising its power to determine if Thompson should be involuntarily committed. See § 916.13, Fla. Stat. (Supp. 1980); Fla.R.Crim.P. 3.212(b). Thompson has not argued that he would have contested the commitment decision if the state had not stipulated that he was insane at the time of the offenses. In any event, the evidence which was relied upon to support the findings of incompetence to stand trial and insanity at the time of offenses could support only the conclusion that Thompson met the criteria for involuntary hospitalization.